[Cite as *State v. Bratt*, 2026-Ohio-2462.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## ASHTABULA COUNTY

| | |
|---|---|
| STATE OF OHIO, | CASE NO. 2025-A-0061 |
| Plaintiff-Appellee, | |
| - vs - | Criminal Appeal from the Court of Common Pleas |
| SCOTT O. BRAAT, | |
| Defendant-Appellant. | Trial Court No. 2025 CR 00019 |

## OPINION AND JUDGMENT ENTRY

Decided: June 29, 2026
Judgment: Affirmed

*April R. Grabman*, Ashtabula County Prosecutor, and *Dane R. Hixon*, Assistant Prosecutor, 25 West Jefferson Street, Jefferson, OH 44047 (For Plaintiff-Appellee).

*Gabrielle M. Ploplis*, 4043 Erie Street, Willoughby, OH 44094 (For Defendant-Appellant).

JOHN J. EKLUND, J.

{¶1} Appellant, Scott O. Braat, appeals his convictions for Having Weapons While Under Disability and Inducing Panic following a jury trial in the Ashtabula County Court of Common Pleas.

{¶2} Appellant raises seven assignments of error, arguing: (1) the indictment charging him with Inducing Panic was deficient; (2) the trial court erred by allowing the jury to read a transcript of a 911 call where the audio and transcript differed; (3) trial counsel was ineffective for failing to challenge the accuracy of the 911 transcript and failing to object to its admission as an exhibit; (4) trial counsel was ineffective for failing to object to the admission of an exhibit that referenced rape allegations; (5) the trial court

erred by imposing the maximum sentence for both counts; (6) the convictions were against the manifest weight of the evidence; and (7) the convictions were not supported by sufficient evidence.

{¶3} Having reviewed the record and the applicable law, we find Appellant's assignments of error to be without merit. First, the indictment put Appellant on sufficient notice of the underlying predicate offenses necessary for a conviction of Inducing Panic. Second and third, the admission of a transcript of a 911 call was not in error given the admission of the 911 audio call and instruction that the transcript was not evidence. Fourth, the inadvertent admission of a police report as an exhibit that contained a reference to pending rape charges against Appellant did not raise a reasonable probability that the outcome of the trial would have been different in its absence. Fifth, the trial court's sentence was not otherwise contrary to law, and we will not reweigh the sentence. Finally, the conviction was supported by sufficient evidence and was not against the manifest weight of the evidence because Appellant's conduct caused a disruption to the use of a busy public roadway, as deputies blocked the road during the incident.

{¶4} Therefore, the judgment of the Ashtabula County Court of Common Pleas is affirmed.

**Substantive and Procedural History**

{¶5} On February 13, 2025, Appellant was indicted by the Ashtabula County Grand Jury on the following counts: Count 1, Improperly Discharging a Firearm at or into a Habitation or a School Safety Zone, a fifth-degree felony in violation of R.C. 2923.161, with a three-year firearm specification pursuant to R.C. 2941.145; Count 2, Having

Weapons While Under Disability, a third-degree felony in violation of R.C. 2923.13, with a three-year firearm specification pursuant to R.C. 2941.145; and Count 3, Inducing Panic, a fourth-degree felony in violation of R.C. 2917.31.

{¶6}   Appellant pled not guilty, and the matter proceeded to jury trial.

{¶7}   The following facts and evidence were adduced at trial:

{¶8}   The State called William Reynolds, an Ashtabula County Sheriff's Department 911 dispatcher. Reynolds testified that on December 11, 2024, he received an emergency call.

{¶9}   The State provided a transcript of the 911 call audio to the jury to accompany the audio recording. Appellant's trial counsel objected to the use of the transcript, stating that the jury could listen to the testimony and the audio itself. The trial court overruled the objection, saying that the transcript "would be an aid to the jury in listening to the 911 call." The 911 call audio and the transcript of the audio are almost entirely identical. However, there are several differences.

{¶10}  A female caller, identified as Alexandra Kuta, stated that Appellant, her fiancé, "was supposed to go to court today, I came home from work and . . . he has my gun." Reynolds asked if Appellant had made specific threats. While the transcript does not include Kuta's response, the 911 audio reflects that Kuta responded that Appellant was in the garage and wanted to kill himself. Kuta also said that Appellant had been drinking and was intoxicated.

{¶11}  An audible "pop" is discernable on the 911 audio. Kuta told Reynolds that she heard a pop, and Reynolds initially believed Appellant had shot himself. She then told Reynolds that Appellant had not shot himself. At this point, Reynolds said that his concern

Case No. 2025-A-0061

shifted to Appellant still being alive and armed and posing a danger to responding deputies or other people at the scene.

{¶12} The first deputies arrived on the scene during the 911 call. Shortly after their arrival, Appellant can be heard yelling, "Detective Barger, that son of a b**** ruined my life" and calling him a "mother f*****." He can also be heard yelling, "you all are lying pieces of f****** s***." He accused them of taking his DNA and said that it did not match up, which cost him his life and his house. He also yelled that Detective Barger should not "get out of your car, you cop f***. I promise you this don't get the f*** . . . I swear to God." He also says, "there ain't no f****** talking no more. You mother f*****. You c*** suckers."

{¶13} Appellant's trial counsel identified the timestamp of 6:35 on the 911 audio as being different than what was reflected in the audio transcript. With the volume all the way up, Reynolds testified that he could hear somebody say two times that the gun had jammed. This statement, although audible on the 911 call audio, was not reflected in the transcript.

{¶14} Deputy Robert Ginn, Deputy Jeremy Cusano, Deputy Eric Massie, Deputy Matthew McBride, Detective Evan Wolff, and Lieutenant Stephen Murphy, Ret., from the Ashtabula County Sheriff's Office, all responded to the scene.

{¶15} Deputy Ginn said that he was dispatched to an emergency call at 1:30 p.m. on December 11, 2024, in reference to a female caller stating that her boyfriend went into the garage with a gun. While en route, Deputy Ginn received word from dispatch that the female reported hearing a gunshot in the garage.

{¶16} Deputy Ginn pulled into the driveway of the house believing the suspect had already committed suicide. He saw a white Jeep in the garage with its taillights illuminated

and smoke coming from the exhaust. He heard music playing loudly from the vehicle. He saw Appellant in the Jeep with his leg hanging out of the driver's side of the vehicle. As he approached he heard Appellant yelling loudly with a female, who was standing in the doorway of the house and the garage. Appellant stepped out of the Jeep holding a pistol in his right hand.

{¶17} Around this time, other deputies arrived at the scene. Deputy Cusano testified that he arrived at the scene after Deputy Ginn and stationed himself in the intersection at the corner of the property. He said he parked in the street to restrict traffic coming down the road. He described Appellant as coming in and out of the garage with a gun in his hand. While he was stationed there, a truck stopped behind him in the street. Deputy Cusano told the driver to "get out of here, go." He said he was concerned that civilians would be harmed. Deputy Cusano acknowledged that Appellant never pointed his gun at anyone other than himself when he attempted to kill himself.

{¶18} Deputy Massie testified that he arrived after Deputy Cusano and positioned his vehicle to block traffic "for the safety of the public." Deputy McBride blocked traffic from the other side of the house upon his arrival.

{¶19} Deputy Ginn said that Appellant got out of the Jeep and began walking around it inside the garage. He said Appellant was walking into and out of the garage and then would sit in the corner of the garage. As Appellant was doing this, he was yelling at Kuta, who was inside the house, as well Deputy Ginn, who was behind his police cruiser at the end of the driveway. Deputy Ginn had his weapon drawn and pointed at Appellant. At one point, Appellant put the gun to his head and pulled the trigger, but the gun misfired. After this, Appellant continued moving around the garage. Deputy Cusano and Deputy

Case No. 2025-A-0061

Massie both said that they heard Appellant rack the slide of the gun, clearing the misfired bullet and making it operable again.

{¶20} Appellant yelled certain comments about Detective Barger while deputies were on scene.

{¶21} Lieutenant Murphy arrived, deployed his M4 rifle, and stationed himself next to Deputy Ginn.

{¶22} Eventually, Appellant put the gun down and exited the garage. At this time, Deputy McBride fired non-lethal beanbag rounds at Appellant to incapacitate him. Upon being struck, Appellant ran back into the garage to retrieve the gun. Lieutenant Murphy said that he saw Appellant pick up his gun. Lieutenant Murphy fired his rifle and struck Appellant in the arm, which caused Appellant to drop the gun. After this, deputies apprehended Appellant while Deputy Massie secured Appellant's pistol, which was "within a couple feet, if that" of Appellant.

{¶23} Deputy Ginn, Deputy McBride, and Deputy Massie said that they did not see any neighbors or bystanders during the incident. Lieutenant Murphy said that the "motoring public" was present on the "busy roadway."

{¶24} Michael Rostocil, a Crime Scene Technician at the Ohio Bureau of Criminal Investigation (BCI), testified that he photographed and processed the crime scene for evidence. Rostocil said that he recovered one unfired cartridge and one cartridge casing from the garage. He also said that the only projectile found to have penetrated the residence was one beanbag round.

{¶25} Andrew Chappell, a Forensic Scientist at BCI, testified that the Appellant's 9mm Ruger pistol was found to be operational. He also said that the spent cartridge found

on the scene matched the markings from test fired casings Chappell used for comparison, meaning both came from the same firearm.

{¶26}  Deputy Jonelle Gerke took possession of the evidence BCI collected. The State introduced home security footage of the incident and body camera footage from deputies on scene.

{¶27}  Detective Wolff testified that he arrived after Appellant had been placed in an ambulance and found the scene secured and the road blocked to traffic.

{¶28}  The parties stipulated that Appellant was under disability and not permitted to possess a firearm.

{¶29}  The trial court provided a jury instruction telling the jurors that the transcripts of the 911 call and body camera footage were not evidence and were an aid to help interpret that evidence. Appellant's trial counsel did not object to the admission of the audio transcriptions.

{¶30}  The jury found Appellant not guilty on Count 1 and guilty on Counts 2 and 3.

{¶31}  On October 21, 2025, the trial court sentenced Appellant. The trial court stated that it considered the purposes of felony sentencing and the seriousness and recidivism factors of protecting the public from future crime, punishing the offender, and promoting the effective rehabilitation of the defendant while using the minimum sanctions to accomplish those purposes without imposing an unnecessary burden on state and local government resources.

{¶32}  The trial court acknowledged that the nature of the offense involved a "mental health component" but said that a large component of the offense involved

Appellant being "angry about other things" taking place "with another matter." The trial court said that the Weapons Under Disability offense and the Inducing Panic offense were separate offenses because Appellant chose to escalate the situation once deputies arrived.

{¶33} In reviewing the presentencing investigation, the trial court noted aggravating factors, including that Appellant had 17 prior convictions, had been to prison, and had multiple probation violations. The trial court further said that Appellant was on pre-trial supervision when this offense occurred. As to the mitigating factors, the trial court said that Appellant's mental health issues played a role and that he had a 17-year work history and was now in a good mental state.

{¶34} The trial court imposed 36 months on Count 2 and 18 months on Count 3. The trial court ordered the sentences be served consecutively for an aggregate sentence of 54 months.

{¶35} Appellant timely appealed raising seven assignments of error.

**Assignments of Error and Analysis**

{¶36} Appellant's first assignment of error states: "THE INDICTMENT CHARGING APPELLANT WITH INDUCING PANIC DOES NOT CLEARLY OUTLINE THE PREDICATE OFFENSE(S) AND IS THUS DEFICIENT, DENYING [APPELLANT] DUE PROCESS PROTECTIONS UNDER THE OHIO AND U.S. CONSTITUTIONS."

{¶37} Appellant argues that the indictment for Inducing Panic was defective because it does not specify what underlying offense was the basis for the Inducing Panic offense.

{¶38} The indictment for Count 3, Inducing Panic, provides that Appellant

did cause the evacuation of any public place, or otherwise cause serious public inconvenience or alarm by committing any offense, with reckless disregard of the likelihood that its commission would cause serious public inconvenience or alarm and said conduct resulted in physical harm to any person in violation of Ohio Revised Code §2917.31(A)(3), 2917.31(C)(3), **Inducing Panic**, a felony of the fourth degree.

{¶39} Appellant asserts that the bill of particulars in this case failed to identify the predicate "*any offense*" required under R.C. 2917.31(A)(3) and that the only time the predicate offenses were made clear was in the trial court's jury instruction, which did not provide him with adequate notice.

{¶40} Under Crim.R. 12(C)(2), "[d]efenses and objections based on defects in the indictment" must be raised before trial. Crim.R. 12(H) provides:

Failure by the defendant to raise defenses or objections or to make requests that must be made prior to trial, at the time set by the court pursuant to division (D) of this rule, or prior to any extension of time made by the court, shall constitute waiver of the defenses or objections, but the court for good cause shown may grant relief from the waiver.

{¶41} Because Appellant did not raise this issue below, "under the circumstances of this case, appellant has forfeited all but plain error on review." *State v. Carnes*, 2015-Ohio-4429, ¶ 8 (11th Dist.). "Crim.R. 52(B) affords appellate courts discretion to correct '[p]lain errors or defects affecting substantial rights' notwithstanding the accused's failure to meet his obligation to bring those errors to the attention of the trial court." *State v. Rogers*, 2015-Ohio-2459, ¶ 22. The appellant bears the burden of demonstrating plain error by proving that the outcome would have been different absent the plain error. *State v. Payne*, 2007-Ohio-4642, ¶ 17. The plain error must be a deviation from a legal rule and an obvious defect in the proceedings. *Rogers* at ¶ 22.

{¶42} Further, even when the error is obvious, "it must have affected substantial rights," meaning "'that the trial court's error must have affected the outcome of the trial.'"

*Id*., quoting *State v. Barnes*, 2002-Ohio-68, ¶ 20. This is the same deferential standard applied for "reviewing ineffective assistance of counsel claims." *Id.* Indeed, "even if an accused shows that the trial court committed plain error affecting the outcome of the proceeding, an appellate court is not required to correct it . . . ." *Id.* at ¶ 23. Courts are cautioned "to notice plain error 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *Barnes* at ¶ 21, quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶43} "Under Section 10, Article I of the Ohio Constitution and the Sixth Amendment to the United States Constitution, a person accused of a felony is entitled to an indictment setting forth the 'nature and cause of the accusation.'" *State v. Troisi*, 2022-Ohio-3582, ¶ 21.

> This serves two purposes. First, "[b]y compelling the government to aver all material facts constituting the essential elements of an offense, an accused is afforded with adequate notice and an opportunity to defend." *State v. Sellards*, 17 Ohio St.3d 169, 170 . . . (1985). Second, "[a]n indictment, by identifying and defining the offense, also enables an accused to protect himself from any future prosecutions for the same offense."

*Id.*

{¶44} This case involves the first purpose, adequate notice and an opportunity to defend. *See id.* An indictment will meet these constitutional requirements where it (1) contains the elements of the offense and fairly informs the defendant of the charge to be defended and (2) enables the defendant to "'plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *State v. Childs*, 2000-Ohio-425, ¶ 34, quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974).

{¶45} Crim.R. 7(B) states in relevant part that:

> The statement may be made in ordinary and concise language without technical averments or allegations not essential to be proved. The

Case No. 2025-A-0061

statement may be in the words of the applicable section of the statute, provided the words of that statute charge an offense, or in words sufficient to give the defendant notice of all the elements of the offense with which the defendant is charged.

{¶46} This was a multi-count indictment which set forth the elements of each offense. An indictment may be read in pari materia with related counts. *See State v. Foust,* 2004-Ohio-7006, ¶ 29 ("Reading the felony-murder counts in pari materia with the related felony counts provided ample notification of the elements of the underlying felonies— aggravated burglary, aggravated robbery, rape, kidnapping, and aggravated arson—that the state had to prove.") Reading Count 3 in pari materia with Counts 1 and 2, there can be no reasonable question that Appellant had adequate notice of the predicate offenses constituting the necessary element of Inducing Panic. Having found no obvious error, Appellant cannot demonstrate that his substantial rights were affected.

{¶47} Accordingly, Appellant's first assignment of error is without merit.

{¶48} We address Appellant's second and third assignments of error together.

{¶49} Appellant's second assignment of error states: "TRIAL COURT ERRED IN PERMITTING THE JURY TO READ A TRANSCRIPT OF 911 CALL OVER DEFENSE COUNSEL OBJECTION, EXPECIALLY WHERE TRANSCRIPTS DID NOT ACCURATELY REFLECT THE 911 AUDIO." [sic]

{¶50} Appellant's third assignment of error states: "TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO CHALLENGE THE ACCURACY OF THE 911 TRANSCRIPT, AND FOR FAILING TO OBJECT TO THE TRANSCRIPT'S ADMISSION INTO EVIDENCE AS AN EXHIBIT."

{¶51} Appellant's second and third assignments of error relate to the trial court's admitting the 911 transcript as an exhibit for the jury to use in deliberations and trial

Case No. 2025-A-0061

counsel's failure to object to its admission. This means that we review this issue for plain error and for ineffective assistance of counsel.

{¶52} In reviewing an ineffective assistance of counsel claim, the standard we apply is "'whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" *State v. Story*, 2007-Ohio-4959, ¶ 49 (11th Dist.), quoting *Strickland v. Washington*, 466 U.S. 668, 686 (1984). An appellant must demonstrate (1) counsel was deficient in some aspect of representation, and (2) there is a reasonable probability, were it not for counsel's errors, the result of the proceedings would have been different. *Strickland* at 687, 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694. A failure to "satisfy one prong of the *Strickland* test negates a court's need to consider the other." *State v. Madrigal*, 2000-Ohio-448, ¶ 49.

{¶53} An appellant "'must show that the attorney made errors so serious that he or she was not functioning as "counsel" as guaranteed by the Sixth Amendment, and . . . that he or she was prejudiced by the deficient performance.'" *Story* at ¶ 49, quoting *State v. Batich*, 2007-Ohio-2305, ¶ 42 (11th Dist.). Ohio courts presume that every properly licensed attorney is competent, and therefore a defendant bears the burden of proof. *State v. Smith*, 17 Ohio St.3d 98, 100 (1985). "Counsels performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance." *State v. Bradley*, 42 Ohio St.3d 136, 142 (1989). "Debatable trial tactics generally do not constitute a deprivation of effective counsel." *State v. Phillips*, 74 Ohio St.3d 72, 85 (1995) "'Failure to do a futile act cannot be the basis for claims of

Case No. 2025-A-0061

ineffective assistance of counsel, nor could such a failure be prejudicial.'" *State v. Henderson*, 2007-Ohio-2372, ¶ 42 (8th Dist.), quoting *State v. Shannon*, 1982 WL 5057, *2 (9th Dist. June 16, 1982).

{¶54} Because Appellant did not raise this issue below, "under the circumstances of this case, appellant has forfeited all but plain error on review." *Carnes*, 2015-Ohio-4429, ¶ 8 (11th Dist.). This is the same deferential standard applied for "reviewing ineffective assistance of counsel claims." *Id.*

{¶55} "Where there are no 'material differences' between a tape admitted into evidence and a transcript given to the jury as a listening aid, there is no prejudicial error." *State v. Waddy*, 63 Ohio St.3d 424, 445 (1992). It is not improper for a trial court to permit transcripts of audio recordings to be provided to the jury for use in deliberation, particularly where the transcripts are easier to understand than an audio recording. *State v. Mason*, 1998-Ohio-370, ¶ 94. Where there are differences between the transcripts, it is incumbent on parties to timely object so that revisions may be made before the transcript is provided to the jury. *Id.* at ¶ 92.

{¶56} Evid. R. 1002, the so-called "best evidence rule," provides: "To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio."

{¶57} Courts have held that this rule does not prohibit the admission of a transcript of an audio recording as an aid to the jury where the original recording is also admitted into evidence. *State v. Fitzgerald*, 2007-Ohio-701, ¶ 31 (9th Dist.); *State v. Salyers*, 2020-Ohio-147, ¶ 36 (3d Dist.).

{¶58}   In his brief, Appellant identifies several discrepancies between the 911 call audio and the transcript that was admitted into evidence. First, he states that the transcript omits Kuta telling the 911 dispatcher that Appellant "wants to kill himself." He also highlights that the transcript says he threatens to "fire right in 'the' head rather than his own head. State's Exhibit 2, P6."

{¶59}   As to the first statement, Appellant is correct that the transcript fails to record this. This is surprising because it is not difficult to discern on the 911 audio.

{¶60}   As to the second statement, we cannot say with any certainty whether Appellant's interpretation of the audio is the correct one. Appellant either says "right in the f****** head" or "right in my f****** head."

{¶61}   In either event, these discrepancies, plus the discrepancy trial counsel highlighted during the trial, warrant Appellant's concern. However, despite trial counsel's failure to note these discrepancies, the trial court appropriately addressed this issue by instructing the jury that the transcripts of audio recordings admitted into evidence were merely an aid to help interpret the audio recordings.

{¶62}   The main thrust of Appellant's argument is that the "911 audio makes clear that any threats made were to *himself*, and further demonstrates what his intent was: suicide." (Emphasis in original.)   Appellant argues that the transcript made it seem as though Appellant threatened Kuta or the deputies, while the 911 audio makes clear that he only threatened harm to himself.

{¶63}   This is not accurate. Kuta told Reynolds that Appellant wanted to kill himself, but Reynolds was also concerned with Kuta's safety. He repeatedly told her to remove herself from the situation because it was volatile and she could be in danger from

Appellant. Appellant can be also heard yelling at Kuta to "go in the house" over and over again. Next, testimony from the deputies on scene and the audio from the 911 call demonstrate that Appellant was upset about his court date and that he made comments about Detective Barger ruining his life and accused the police of lying. He repeatedly yelled that Detective Barger should not get out of his car. Although it does not appear that Detective Barger was present on the scene, this does not change Appellant's hostile and threatening behavior to law enforcement in general.

{¶64} Appellant was in a volatile state and, particularly after Appellant's gun misfired, it is not unreasonable to think that Appellant would try to accomplish his suicide by forcing deputies to take his life. One way of doing that would be to threaten or attempt harm on the deputies. Nothing would suggest that the jury, after hearing the 911 audio in the courtroom, would have been misled about the nature of the call and would have adopted the false impression of the incident that Appellant claims the transcript offers. Appellant has not demonstrated either plain error or ineffective assistance of counsel.

{¶65} Accordingly, Appellant's second and third assignments of error are without merit.

{¶66} Appellant's fourth assignment of error states: "TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO ADMISSION OF STATE'S EXHIBIT 86, WHICH INCLUDED REFERENCE TO RAPE ALLEGATIONS, CONDUCT WHICH APPELLANT HAD NOT BEEN CONVICTED OF."

{¶67} Under this assignment of error, Appellant argues that trial counsel was ineffective for failing to object to the admission of State's Exhibit 86 because it referenced

Appellant's prior rape conviction. The State has conceded that State's Exhibit 86 should not have been admitted but argues that the prejudicial effect of the exhibit was minimal.

{¶68} State's Exhibit 86 was a police report introduced during trial for the sole purpose of refreshing Detective Wolff's recollection about what time the incident took place. The 34-page exhibit makes a reference to Appellant's pending indictment for six counts of Rape. The exhibit was not referenced or relied on in any other way during the trial. However, the exhibit was admitted into evidence and was given to the jury during their deliberations.

{¶69} We agree that this exhibit should not have been admitted. *See* Evid.R. 404(B); Evid.R. 803. We cannot know whether the jury viewed this information. However, the inability to know whether the jury thoroughly reviewed each and every piece of evidence while in the jury room is exactly why it is so important to ensure that only appropriate materials are admitted into evidence. Despite the State's arguments that none of the parties noticed until this issue was raised on appeal, we cannot impute that lack of knowledge to the collective wisdom of the jury. Indeed, we must do the opposite and impute knowledge.

{¶70} Despite this, we cannot say that the admission of this exhibit affected the outcome of the trial. The knowledge of Appellant's rape charges, while highly prejudicial, does not raise a reasonable probability that the outcome of the trial would have been different. There was uncontested evidence that Appellant possessed a firearm while under a disability. Appellant has not even directly challenged that conviction on appeal. In addition, the questions of fact involved in whether Appellant was guilty of Inducing Panic did not turn on Appellant's character or credibility. There were multiple video

recordings of the incident and the deputies' testimony was largely consistent and supported the conclusion that Appellant committed the offense of Inducing Panic. The admission of Exhibit 86 does not undermine our confidence in the outcome of the case. *See State v. Hall*, 2012-Ohio-266, ¶ 24 (8th Dist.) (finding admission of police reports harmless error.)

{¶71} Accordingly, Appellant's fourth assignment of error is without merit.

{¶72} Appellant's fifth assignment of error states: "THE TRIAL COURT ERRED IN IMPOSING THE MAXIMUM SENTENCE FOR BOTH COUNTS, AND THE SENTENCE IMPOSED WAS CONTRARY TO OHIO STATUTE."

{¶73} Appellant argues that the trial court erred by imposing maximum sentences on him because these sentences were not "warranted and unsupported by the record" and the sentences were "harsh, and did not appropriately fit the circumstances." In essence, Appellant asks that we re-weigh the trial court's seriousness and recidivism considerations and find that the trial court's determination was not appropriate.

{¶74} Our standard of review of felony sentences is governed by R.C. 2953.08(G)(2), which provides:

> The court hearing an appeal under division (A), (B), or (C) of this section shall review the record, including the findings underlying the sentence or modification given by the sentencing court.
>
> The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing. The appellate court's standard of review is not whether the sentencing court abused its discretion. The appellate court may take any action authorized by this division if it clearly and convincingly finds either of the following:
>
>> (a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or

(C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant;

(b) That the sentence is otherwise contrary to law.

{¶75} In *State v. Jones*, 2020-Ohio-6729, the Supreme Court of Ohio explained the application of R.C. 2953.08(G)(2) in relation to R.C. 2929.11 and 2929.12. The Court determined that R.C. 2929.11 and 2929.12 are not among the statutory provisions listed in R.C. 2953.08(G)(2)(a). *Id.* at ¶ 28. R.C. 2953.08(G)(2)(a) does not provide a basis for an appellate court to modify or vacate a sentence based on the lack of support in the record for the trial court's findings under R.C. 2929.11 and 2929.12. *Id.* at ¶ 29.

{¶76} R.C. 2953.08(G)(2)(b) permits an appellate court to review whether a sentence is "otherwise contrary to law." But, in *Jones*, the Court determined that this phrase is not "equivalent" to "an appellate court's conclusion that the record does not support a sentence under R.C. 2929.11 or 2929.12." *Id.* at ¶ 34. Thus, the *Jones* Court held that "[n]othing in R.C. 2953.08(G)(2) permits an appellate court to independently weigh the evidence in the record and substitute its judgment for that of the trial court concerning the sentence that best reflects compliance with R.C. 2929.11 and 2929.12." *Id.* at ¶ 42. That is precisely what Appellant wants us to do, but we cannot.

{¶77} The trial court scrupulously made all necessary seriousness and recidivism findings. The sentence imposed was not otherwise contrary to law, and we may not re-weigh the trial court's seriousness and recidivism findings to conclude that the maximum sentence was inappropriate.

{¶78} Accordingly, Appellant's fifth assignment of error is without merit.

{¶79} We address Appellant's sixth and seventh assignments of error together.

{¶80} Appellant's sixth assignment of error states: "THE APPELLANT'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶81} Appellant's seventh assignment of error states: "THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE TO PROVE EACH AND EVERY ELEMENT OF THE OFFENSES BEYOND REASONABLE DOUBT." [sic]

{¶82} Appellant argues that his Inducing Panic conviction is against the manifest weight of the evidence and is not supported by sufficient evidence. He does not advance any argument pertaining to his conviction for Having a Weapon While Under Disability. Therefore, we do not address that conviction in resolving these assignments of error.

{¶83} ""Sufficiency" is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.'" *State v. Thompkins*, 1997-Ohio-52, ¶ 23, quoting *Black's Law Dictionary* (6th Ed. 1990). "In essence, sufficiency is a test of adequacy." *Id*. "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id*.

{¶84} "[W]eight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson*, 2007-Ohio-2202, ¶ 25. "In other words, a reviewing court asks whose evidence is more persuasive—the [S]tate's or the defendant's?" *Id*. In considering

Case No. 2025-A-0061

whether a conviction is against the manifest weight of the evidence, "'[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at ¶ 24, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). "'The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*, quoting *Martin* at 175.

{¶85} R.C. 2917.31(A)(3) provides:

(A) No person shall cause the evacuation of any public place, or otherwise cause serious public inconvenience or alarm, by doing any of the following:

. . .

(3) Committing any offense, with reckless disregard of the likelihood that its commission will cause serious public inconvenience or alarm.

{¶86} R.C. 2901.22(C) provides:

A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature.

{¶87} Appellant argues that his Inducing Panic conviction should be reversed because the State failed to establish that his conduct caused serious public inconvenience or alarm. He says that the State did not provide clear evidence that the roadway outside of his house was blocked to public traffic. He also asserts that if there was such evidence, this blockage did not constitute a serious public inconvenience because the area was a sparsely populated residential area and the public was still able to travel nearby side streets. He further argues that the record did not establish any

Case No. 2025-A-0061

inconvenience that was caused to a single member of the public. Finally, he argues that he lacked the necessary intent to commit the offense.

{¶88} Appellant cites several cases for the proposition that conduct occurring at the home that does not disrupt a public place or cause a serious public inconvenience does not satisfy the requirements set forth in the statute. *See State v. Wetherby*, 2013-Ohio-3442 (5th Dist.); *State v. Walters*, 2009-Ohio-2076 (2d Dist.); *In re D.W.*, 2024-Ohio-2564 (7th Dist.); *State v. Kristofferson*, 2002-Ohio-712 (1st Dist.).

{¶89} We have held that a conviction for Inducing Panic requires the perpetrator "to cause an evacuation *or 'otherwise* cause serious public inconvenience or alarm'; that is, the absence of an evacuation does not negate a finding of serious public inconvenience or alarm under the statute." (Emphasis in original.) *In re J.C.*, 2013-Ohio-1292, ¶ 19 (11th Dist.), quoting R.C. 2917.31(A).

{¶90} Although the statute does not define the term "serious public inconvenience or alarm," we have held that "mere public awareness of an event is not sufficient to satisfy the element" of the offense. *Id.* at ¶ 20. Rather, "there must be some type of disruption, discomfort, distress, or fear caused by one or more of the three predicate actions found in R.C. 2917.31(A)(1)-(A)(3)." *Id.*

{¶91} In *Kristofferson,* 2002-Ohio-712 (1st Dist.), the defendant threatened to commit suicide while in his own home. *Id.* at ¶ 1. Police took him into custody after approximately eight minutes. *Id.* at ¶ 3. The defendant did not threaten or attack the responding officers. *Id.* He was then charged with Inducing Panic under R.C. 2917.31(A)(2). However, the First District determined that the inconvenience cause to on-duty police officers did not satisfy the "public inconvenience" element of the statute. *Id.* at

Case No. 2025-A-0061

¶ 11. The court said that because there was no evidence of any inconvenience caused to the public, there was insufficient evidence to sustain a conviction. *Id.*

{¶92} In *In re D.W.*, 2024-Ohio-2564 (7th Dist.), the court said that a student dropping a notebook containing a threat to burn the school down was seen by five individuals who were inconvenienced and/or alarmed." *Id.* at ¶ 52. However, the court said that there was insufficient evidence to sustain a conviction for Inducing Panic because "there was no evidence showing '*serious public* inconvenience or alarm." (Emphasis in original.) *Id*.

{¶93} In *Wetherby*, 2013-Ohio-3442 (5th Dist.), deputies served a writ of possession. *Id.* at ¶ 2. When deputies returned to enforce the writ, a co-defendant ran into the house and refused to leave. *Id.* at ¶ 4.  The defendant was in the house and also refused to come out. *Id.* A negotiation ensued, which resulted in a SWAT team arriving and at least 25 law enforcement officers responding to the scene. *Id.* at ¶ 7. The two men demanded to speak to news media, and the defendant eventually left the house to be interviewed, at which time he was arrested. *Id.* at ¶ 10.

{¶94}  The Fifth District held that none of the defendant's actions caused serious public inconvenience or alarm because the "[o]fficers acting in their official capacity could not have been inconvenienced within the contemplation of R.C. 2917.31(A), simply because they had responded to the residence, as their duties required them to do." *Id.* at ¶ 40.

{¶95}  In *Walters*, 2009-Ohio-2076 (2d Dist.), the defendant discharged an air gun in his backyard, and the neighbors call the police two times as a result. *Id.* at ¶ 22. The defendant also had an altercation with his sister and grandmother which resulted in

Case No. 2025-A-0061

officers taking up "surveillance positions around Defendant's home." *Id.* at ¶ 23. "[S]everal neighbors looked out of their homes during the forty-five minutes the officers were there, to see what was happening, and were waved back inside by the officers." *Id.* However, the court held that "[t]he neighbors' inability to satisfy their curiosity does not demonstrate serious public inconvenience or harm. There is no evidence that Defendant's neighbors were otherwise unable to leave their homes." *Id*.

{¶96} After this, the defendant left the home in a car, which resulted in a three-to-four-mile pursuit at speeds of up to fifty miles per hour. *Id.* at ¶ 24. The court said that there was no evidence that this pursuit directly affected any members of the public, "much less that any serious public inconvenience or harm was caused." *Id.*

{¶97} Here, although this case did not involve an evacuation, it did cause serious public inconvenience and alarm by causing a disruption to the public in order to stop Appellant's behavior. This incident did not take place inside of the home but rather in the open garage and in the driveway. The behavior involved Appellant discharging his firearm before officers arrived and attempting to shoot himself in the head once deputies were present. Finally, after being struck by a non-lethal beanbag round, Appellant rushed to retrieve his gun, resulting in one officer discharging his firearm. Unlike in *Kristofferson,* 2002-Ohio-712 (1st Dist.), Appellant did not merely inconvenience the responding deputies. Instead, Appellant's conduct resulted in deputies discharging both non-lethal and lethal weapons at Appellant. These actions demonstrated a reckless disregard of the likelihood of disrupting the public surrounding his home.

{¶98} To be clear, the serious public inconvenience was not caused to the deputies who arrived at the scene to engage in their duties. Rather, the serious public

Case No. 2025-A-0061

inconvenience was caused to the public as a result of Appellant's conduct. Lieutenant Murphy described the roadway as "busy" and said that the "motoring public" was put at risk by Appellant's actions. The deputies blocked off the street and stationed themselves in the street at opposite ends of Appellant's house. The deputies were in cover positions with weapons drawn in a public roadway for the duration of the incident, which culminated in both lethal and non-lethal rounds being fired. The incident took place during daylight hours and was readily visible to anyone in the area.

{¶99} The issue of whether the roadway was blocked was a question of fact that we find was supported by credible evidence from the testimony of several deputies and the video exhibits introduced at trial. At least one member of the public was in close proximity to the incident as Deputy Ginn was arriving, and Deputy Ginn told that person to "get out of here, go." The record is not clear on how long the road was blocked to traffic, but the length of time appears to be approximately 10-15 minutes. During that time, deputies were stationed behind their cruisers with guns drawn.

{¶100} We find that there was sufficient evidence to sustain Appellant's conviction.

{¶101} Similarly, we cannot say that the jury lost its way in weighing the credibility of the evidence. The jury made the reasonable conclusion that Appellant's conduct created serious public inconvenience. The State's evidence in support of Inducing Panic was credible. The record is clear as to what occurred once deputies arrived at the scene. Indeed, the jury found Appellant not guilty as to the Discharging a Firearm Into a Habitation count while finding him guilty on the other counts. This was not a jury that lost its way. For the reasons described above, the verdict was neither against the manifest weight of the evidence nor otherwise a manifest miscarriage of justice.

Case No. 2025-A-0061

{¶102} Accordingly, Appellant's sixth and seventh assignments of error are without merit.

{¶103} For the foregoing reasons, the judgment of the Ashtabula County Court of Common Pleas is affirmed.


EUGENE A. LUCCI, J.,

ROBERT J. PATTON, J.,

concur.

Case No. 2025-A-0061

# JUDGMENT ENTRY

For the reasons stated in the opinion of this court, Appellant's assignments of error are without merit. It is the judgment and order of this court that the judgment of the Ashtabula County Court of Common Pleas is affirmed.

Costs to be taxed against Appellant.

JUDGE JOHN J. EKLUND

JUDGE EUGENE A. LUCCI,
concurs

JUDGE ROBERT J. PATTON,
concurs

**THIS DOCUMENT CONSTITUTES A FINAL JUDGMENT ENTRY**

A certified copy of this opinion and judgment entry shall constitute the mandate pursuant to Rule 27 of the Ohio Rules of Appellate Procedure.

Case No. 2025-A-0061